## UNITED STATES v. INTERSTATE COMMERCE COMMISSION et al.

### Civ. A. No. 4729–47.

United States District Court
District of Columbia.

Sept. 29, 1950.

Herbert A. Bergson, Assistant Attorney General, George Morris Fay, United States Attorney, Washington, D. C., James E. Kilday, David O. Matthews, Special Assistants to the Attorney General, Frank F. Vesper, James C. Moore, Washington, D. C., Special Attorneys, Department of Justice, for the United States.

A. J. Dixon, Washington, D. C., for Southern Ry. Co.

Martin A. Meyer, Jr., Washington, D. C., for Virginian Ry. Co.

Charles P. Reynolds, Washington, D. C., for Atlantic Coast Line R. Co., Seaboard Air Line R. Co., and Norfolk Southern Ry. Co.

Hugh B. Cox, Washington, D. C., Windsor F. Cousins, Philadelphia, Pa., for Pennsylvania R. Co.

Daniel W. Knowlton, Chief Counsel, Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission.

Benjamin J. Brooks, Falls Church, Va., amicus curiae.

MORRIS, District Judge.

This is a proceeding in which the petitioner seeks a determination that a certain order of the Interstate Commerce Commission, dated July 25, 1947, is unlawful, arbitrary, capricious, and without support in and contrary to the law and evidence. The petition further asks that a perpetual

injunction setting aside and annulling said order be granted, and that the cause be remanded to the Interstate Commerce Commission for further action. Subsequent to the filing of these proceedings in this Court, a three-judge court was convened, which, upon motion of the defendants, dismissed the petition, D.C., 78 F.Supp. 580, upon the ground that the United States of America could not maintain the proceedings as petitioner, as it was required by law to be a defendant in such proceedings, and to defend the action of the Interstate Commerce Commission. Upon appeal, the order of such three-judge court was reversed by the Supreme Court, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451, which held that the United States could maintain a proceeding in a District Court to be heard in due course, not by a three-judge court. Upon remand, the cause came on for hearing upon the record of the proceedings in the Interstate Commerce Commission, oral arguments of counsel for all parties, and upon briefs submitted.

The controversy before the Interstate Commerce Commission and in this Court resulted from the failure of the defendant railroads serving the Port of Norfolk, Virginia, to make an allowance for wharfage and handling charges on freight shipped by the Government to Army Base Piers 1 and 2, Norfolk, Virginia, for export, subsequent to June 15, 1942, when the United States Army took over the operation of such piers, and during the period said piers were being operated by the Army. These piers were constructed by the United States Army in the latter part of World War I and completed shortly after the prosecution of that war. The piers were then leased by the Government to the city authorities of Norfolk, Virginia, for operation as public piers, which lessee was succeeded by a corporation, also operating the piers as public facilities, which in turn was succeeded by the Transport Trading and Terminal Corporation, which corporation was operating the said piers at the time the Army determined, on account of the war conditions, to take over their operation. At the time of the cancellation of the lease of the piers to the Transport

Trading and Terminal Corporation, that company acted as a public wharfinger and as agent and servant of the defendant railroads serving the Port of Norfolk, and had custody of all freight shipments moving to such piers for export or coastwise shipment. Carload freight was switched from the adjacent yards to the piers and unloaded for shipside delivery. The Norfolk and Portsmouth Belt Line Railroad Company handled the movement of cars consigned to the piers for a number of the defendant railroads for unloading. By contract, the defendant railroads agreed to pay the Transport Trading and Terminal Corporation a wharfage charge of 1 cent per hundred pounds and a handling charge for unloading from cars to the pier floor of 3 cents per hundred pounds on all traffic shipped for export, with exceptions as to certain types of freight and freight moving in open cars. The Belt Line published in its tariff a rate for shipside delivery on freight moving to the piers operated by the Transport Trading and Terminal Corporation which included these wharfage and handling charges. Many of the defendant railroads, by reference to the Belt Line tariff, agreed to absorb such handling charges in their line haul rate. Others of the defendant railroads, by their own tariffs, made the same absorption. After the Government took over the operation of the piers and assumed exclusive direction for the movement of cars from the storage tracks adjacent to the piers and the unloading of all freight, it demanded that the 1 cent per hundred pounds wharfage and the 3 cents per hundred pounds handling charges be allowed or paid by the defendant railroads in lieu of that service which had previously been performed by the Transport Trading and Terminal Corporation. This the defendant railroads declined to do. Demand was thereupon made upon the defendant railroads to perform the services for which such charges had theretofore been allowed, it being stated that such demand was made for the purposes of the proceedings then contemplated before the Interstate Commerce Commission. The defendant railroads insist that, in the situation existing,

with traffic, due to war conditions, ten times greater than normal being handled in unusual manner to meet such conditions, and the piers being operated under the exclusive direction of the Army, and not by their agent, such services could not be performed. The position of the defendant railroads was and is that the export rate has no application to the movement of freight, where delivery is made to the owner of freight instead of to agents of the carriers for export handling. At the asking of the Government, however, and under the provisions of Section 22 of the Interstate Commerce Act, 49 U.S.C.A. § 22, the defendant railroads did allow the export rate on freight moving to Army Piers 1 and 2, Norfolk, Virginia, which rate is lower than the domestic rate which would ordinarily apply to freight delivered to the owner of such freight for handling, even though it was ultimately to be exported. The railroads, however, declined, in addition to the allowance of this more favorable rate, to perform the accessorial services covered by the 4 cents per hundred pounds here in controversy.

Such was substantially the status of the controversy when hearings were had before the Examiner of the Interstate Commerce Commission. Substantial testimony was taken and numerous exhibits placed in evidence. The Examiner's report, after reviewing much of the evidence and applicable law, concluded that the complaint should be dismissed. A hearing was had before Division 2 of the Commission, consisting of three Commissioners, as a result of which that Division, one Commissioner dissenting, sustained the exceptions to the Examiner's report, and found that the export rate, without the allowance of the warfage and handling charges, was unreasonable and unjustly discriminatory, and that such allowance should be made with respect to freight already handled and with respect to any future shipments of such freight. Upon reconsideration by the Commission, four Commissioners dissenting, the action of Division 2 was overruled and the complaint dismissed. Upon reargument before the Commission, five Commissioners dissenting, the action dismissing the complaint was affirmed, and

the order complained of in these present proceedings was entered.

The position of the Government before the Commission, as here, is grounded principally upon two propositions: First, that the publication of the tariff quoting rates for shipside delivery, including wharfage and handling charges, to the two piers here involved as the piers of the Transport Trading and Terminal Corporation, created an obligation either to perform those services or make a 4 cents per hundred pounds allowance in lieu thereof, because such tariff provisions was a designation of the terminal facility rather than the operator of the terminal facility. It is also insisted by the Government that the failure to perform the accessorial services or make the allowance in lieu thereof, which by contract had been theretofore paid by the defendant railroads to the corporation operating the terminal facility as a public wharfinger, was a discrimination against the Government, resulting in an unjust enrichment in that the defendant railroads were paid in their freight rate for services they did not perform. The contentions of the Government are well pointed up by their alternative asking for relief before the Commission that the defendant railroads be required to publish a tariff separating the factors of the line haul rate and the wharfage and handling charges.

Apart from the origin and history of export rates, and the inclusion of certain accessorial services without additional charges therein, the construction of the tariff provisions sought by the Government does not appear to be unreasonable. The question of alleged discrimination must also be answered with reference to the origin and history of such practice. While, in recent years, the revision of domestic freight rates has been largely brought about with relative distances as the major determining factor, this is not so with respect to export rates. Too many considerations of competition, not only between railroad and other carriers at the same port, but between the different ports in the North Atlantic, the South Atlantic and Gulf ports, and between the ports of those sections and Canadian ports have all contrib-

uted to the extraordinary eccentricity of export freight rates. The upshot is that, using Baltimore as a base for North Atlantic export freight rates, such rates to Philadelphia, New York and Boston are arrived at by adding to the Baltimore domestic rate, and Norfolk, which is a considerably longer haul from the basic points of origin than is Baltimore, has its export rates fixed substantially the same as the domestic rate to Baltimore. The result is that the export rate to Norfolk is approximately 9 per cent less than domestic rates to that point. For import, export and coastwise shipping, these various ports employ certain, but not the same, accessorial services, for which charges generally are not made in addition to the line haul export rate. Effort has been made in the past to have these charges separated from the line haul rate, but the Interstate Commerce Commission, after extended study, determined that the stability of the rates would be impaired by such separation. Such accessorial services between railroad carriers and ship are not a part of the carrier's responsibility as such. Such responsibility, where it exists, arises only by virtue of published tariff rates. Where freight is consigned from an inland point for export or coastwise shipping, or where importation of freight is destined to an inland point, ordinarily the owner of the freight is not present at the port, and cannot perform the service of unloading carload freight and arrange for the wharfage over which the freight must move to or from the ship. Railroad carriers, to meet this situation, although not required by their duty as a common carrier to do so, in some instances constructed their own piers and wharfs, performing for the owner of the freight the transfer services which the owner could not himself perform. Again, the competition between ports brought about the construction and operation of piers by public wharfingers, who held themselves out to serve the public generally, including railroad carriers who did not have their own facilities for such service. The absorption of the wharfage and handling charges on such piers, railroad or public, have never included all export freight, excluding, among other types, such freight as could be unloaded from the cars by ship's tackle. Not only has the export rate, whether including wharfage and handling allowances or not, been limited as to the character of the freight, but it has also always been limited to that situation where the railroad carrier itself, or through its agent, has had the custody of the freight passing from the line haul carrier to the ship, or vice versa. This practice is so definitely fixed that even in the case of the public wharfingers at the Port of Norfolk, including the Transport Trading and Terminal Corporation, which operated the piers here involved prior to their operation by the Army, contract limitations provide that neither the export rate nor any allowance for wharfage and handling shall be allowed or paid to such public wharfingers with respect to freight of which such public wharfinger is the owner. Many owners of freight have constructed and operate their own private piers and wharfs. For their own convenience, and to meet their own peculiar needs, they receive carload freight, make the unloadings, provide such storage as necessary, and perform all handling incident to its transshipment by vessel. Where the owner of such freight, for his own convenience and to meet his own particular needs, performs those services, which would otherwise be performed by the rail carrier or its agent, he cannot recover any payment or allowance for such accessorial services. It cannot be doubted that, because of the exigencies of war, the movement of freight over the two army piers here in question had to be handled to meet the convenience and peculiar needs of the Government, owner of the freight, under its sole and exclusive direction. The movement of cars to the pier had to be such as to suit the convenience of the Government, and not the convenience of the rail carriers. The loading of ships had to be planned and executed for convoy sailing times, and frequently the loading of one ship was interrupted to enable one of prior urgency to be handled. Labor had to be performed not only with all civilians available, but more often than not troops and war prisoner labor had to be employed. Surely these extraordinary war conditions had to be met by the National Government, and not by the defendant railroads, and

it is equally sure that it was not discrimination against the Government in these circumstances to insist that it be treated, with respect to wharfage and unloading charges, on the exact parity that a private owner of freight would be treated. Nevertheless, the defendant railroads did accord to the Government on its freight the lower export rate than it could legally accord to private parties to whom was made delivery of their own freight, though in neither case were the accessorial services performed or payment or allowances made therefor. As to the contention that the Government should be treated as was the private corporation which operated the piers before the Government took over operation, the short answer is that it was so treated in that in neither case did the defendant railroads, or their agents, perform the accessorial services, or make any payment or allowance therefor, with respect to its own freight.

There remains only then the question as to whether or not the export rate, without the performance or payment for the performance of the accessorial services, was unreasonable and unjust. Unless it is, there is no unjust enrichment. The Interstate Commerce Commission has determined that it was not unreasonable or unjust. It has further found that, if such rate were further lowered by making payment or allowance for the accessorial services, the remaining line haul rate would be that much more below the limit of reasonableness. There is nothing inherently in the nature of export freight which entitles it to move at a lower rate, provided discrimination between shippers is avoided. It is urged by the Government that an export rate can be lower than a domestic rate and still be unreasonable, but the Interstate Commerce Commission has pointed out that no showing has been made here that the export rate involved is unreasonable, and has found and determined that it is not. By reference to the comparison of export rates and the domestic rates to the same points, which have been determined to be reasonable, and with which the record in this case abounds, it cannot be said that this determination is not supported by the evidence, or that it is arbitrary or capricious. As already stated, the structure of a freight rate, such as is here involved, is affected by many and complicated factors. It is hard to conceive of anything requiring more intimate knowledge of the needs of rail carriers and the many types of competitive freight carriage, the needs of shippers and the flow of trade through the various competing ports than does the fair and objective determination of a proper rate for the movement of freight to or through a given port. Practices that have found their origin and development in the field of enterprise and competition ought not to be lightly struck down by any authority not having intimate and continuing responsibility and direction in the field where such practices are employed. This is primarily the reason the Interstate Commerce Commission was brought into being, and why the Congress has committed to its charge the determination of these and related matters. There has been a marked recognition in recent years that in administrative investigation and determination is to be found the surest way of informed governmental action, provided such action is safeguarded by judicial review, which should, while giving great weight to such administrative determination, unhesitatingly demand fair treatment of the parties at interest and prevent any action which is arbitrary or not in accordance with law. It is simply unthinkable that, if the payment and allowance here sought by the Government had been sought by a private party, it would receive any favorable consideration. It is of incomparable importance that, where the action of an administrative organ of the Government makes its decision after fair hearing upon evidence ample to support it, and in accordance with principles long recognized to be applicable, such decision should not be disturbed by a court because it happens not to give financial advantage to the Government as a shipper of freight. Nothing could more surely lead to the overthrow of confidence in the proper functioning of administrative agencies, upon the proper working of which the successful operation of our Government so largely depends.

The action of the Interstate Commerce Commission was founded upon ample evidence, and is in accordance with law. The petition will be dismissed.