### UNITED STATES v. INTERSTATE COMMERCE COMMISSION et al.

#### No. 10879.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 12, 1951.

Decided July 18, 1952.

Wilbur K. Miller, Circuit Judge, dissented.

---

Ralph S. Spritzer, Atty., Department of Justice, Washington, D. C., of the Bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Asst. Atty. Gen. Morison, and Joe F. Nowlin, Sp. Asst. to the Atty. Gen., were on the brief, for appellant. George Morris Fay, U. S. Atty. at the time the brief was filed,

Washington, D. C., Joseph M. Howard, Asst. U. S. Atty., Charles H. Weston, Atty. Department of Justice, Washington, D. C., and Charles L. Beckler, Attorney, Department of Justice, Bethesda, Md., also entered appearances on behalf of appellant.

Daniel W. Knowlton, Chief Counsel, Interstate Commerce Commission, Washington, D. C., for appellee Interstate Commerce Commission. J. Stanley Payne, Atty., Interstate Commerce Commission, Washington, D. C., also entered an appearance on behalf of appellee Interstate Commerce Commission.

Windsor F. Cousins, Philadelphia, Pa., of the Bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of Court, with whom Hugh B. Cox, Charles P. Reynolds, Martin A. Meyer, Jr., and Arthur J. Dixon, Washington, D. C., were on the brief, for appellees Pennsylvania R. Co. and others. Fred N. Oliver, New York City, also entered an appearance on behalf of the Virginian Ry. Co. and Charles Clark, Washington, D. C., entered an appearance on behalf of the Southern Ry. Co.

Before WILBUR K. MILLER, BAZELON and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

This is a controversy between the Government and certain railroads relative to allegedly unlawful charges made by the carriers in connection with export freight handled for the Government during World War II. The litigation has had a lengthy history. It was before the Supreme Court in 1949, and at that time Mr. Justice Black, speaking for the Court, thus described its background:

"During the war, existing tariffs of many railroads embodied wharfage charges to compensate the railroads for moving goods from railroad cars to piers and from piers to railroad cars. When the United States took over certain piers at Norfolk, Virginia, it began to perform these wharfage services for itself and requested the railroads to make the United States an allowance for the expenses incurred in performing the services. The railroads refused to make an allowance.

Upon this refusal the Government requested the railroads to perform the services themselves. The railroads refused to perform the services.

"The United States filed with the Interstate Commerce Commission a complaint against the railroads charging that exaction of pay for unperformed services was unjust, unreasonable, discriminatory, excessive, and in violation of certain sections of the Interstate Commerce Act. The complaint asked the Commission to find the charges unlawful. Further relief asked, under the Interstate Commerce Act, was that the Government be awarded damages (reparations) on account of the alleged unlawful exactions. The Commission found that the charges were not unjustly discriminatory, unreasonable, or otherwise in violation of the Act. Accordingly, the Commission denied reparations and ordered the complaint dismissed. United States v. Aberdeen & Rockfish R. Co., 269 I.C.C. 141 (1947).

"The United States brought this action in a United States District Court to set aside the Commission order. The complaint charged that the Commission's conclusions were not supported by its findings, that the findings were not supported by any substantial evidence, that the order was based on a misapplication of law and was 'otherwise arbitrary, capricious and without support in and contrary to law and the evidence.' The Interstate Commerce Commission was made a defendant. The United States was also made a defendant because of a statutory requirement that any action to set aside an order of the Interstate Commerce Commission 'shall be brought * * * against the United States.' 28 U.S.C. (1946 ed.) § 46 [now § 2322]. Railroads that collected the wharfage charges intervened as defendants under authority of 28 U.S.C. (1946 ed.) § 45a [now § 2323]. The Attorney General appeared for the Government as both plaintiff and defendant. * * *" United States v. Interstate

Commerce Commission, 337 U.S. 426, 428–429, 69 S.Ct. 1410, 1412, 93 L.Ed. 1451.

The case was initially heard by a three-judge district court. Without reaching the merits of the controversy, that court dismissed on the ground that the Government could not maintain a suit against itself. On appeal, the Supreme Court reversed this ruling, held that the Government was entitled to judicial review, and remanded the case to the United States District Court for the District of Columbia for consideration of the merits by a single district judge. 337 U.S. at page 444, 69 S.Ct. 1410.

On remand, the District Court (Judge Morris) reviewed the record of the proceedings before the Interstate Commerce Commission. In an able opinion, the court discussed the contentions of the parties, and concluded that the action of the Interstate Commerce Commission was "founded upon ample evidence, and is in accordance with law." United States v. Interstate Commerce Commission, D.C.D.C., 92 F.Supp. 998, 1002. An order was thereupon entered dismissing the Government's complaint. This appeal followed.

## I.

The salient facts are these: Shortly after the end of World War I the Government completed construction of two large wharves at the port of Norfolk, Virginia, known as Army Base Piers Nos. 1 and 2. These piers, which were the largest at the port, were then leased successively to various terminal operating companies for operation as public wharves. In July of 1940, the facilities were leased to the Transport Trading & Terminal Corporation which, like its predecessor, operated them as agent for the appellee railroads.

The terminal services rendered by the Terminal Corporation included what is known as wharfage and handling. Wharfage refers to the provision of space on the docks for storage of freight pending transfer between freight cars and cargo vessels; handling refers to the unloading of goods from freight cars and placing them on the docks within reach of ship's tackle (or, in the case of imports, loading of goods into cars from the wharf). For most classes of freight, the Terminal Corporation was compensated for these services at the rate of 1¢ per 100 lbs. for wharfage and 3¢ per 100 lbs. for handling. The appellee railroads undertook in their filed tariffs to absorb these charges as part of their "shipside" line-haul export rates, and they paid the Terminal Corporation for its services in connection with shipments covered by this tariff undertaking. For many years this had been the common practice among railroads at Atlantic Coast piers operated as public terminals—that is, piers open to shippers generally and not owned or operated by the owners or shippers of the freight passing over them.

With the outbreak of World War II traffic moving through the port of Norfolk greatly increased. Within a few months after our entry into the war, shipments over Army Base Piers Nos. 1 and 2, which even in pre-war days had constituted half the Norfolk traffic, increased to the point where they vastly exceeded the capacity of all other facilities controlled by the railroads. On June 15, 1942, the Army decided to assume direct control of its two piers and canceled the lease to the Transport Trading & Terminal Corporation. It continued, however, to operate the piers with the personnel and organization used by the ousted lessee. As traffic continued to increase, it supplemented this civilian force with military personnel and prisoners of war. From the time the Army took over direct operation until the end of the period involved in this litigation, the vast bulk of the traffic over the Army Base piers was Government traffic. But other freight was not excluded, and during this period the Army handled some 700 carloads of regular commercial freight, in connection with which it furnished wharfage and handling.

When the Transport Trading & Terminal Corporation was dispossessed, the railroads, of course, ceased paying it for terminal services. These services were now performed by the Army; but the railroads made no payments to the Army for them, nor did they provide any reduction in line-haul rates. One week after the Army took

over the piers it requested that the payments formerly made to the Terminal Corporation now be allowed to the Government and that the railroads' tariffs be appropriately amended. App. 331, et seq. The carriers—with the exception of one line not involved in this litigation—refused the request. Upon continued refusal by the railroads to comply, the Government in May of 1943 requested the defendant railroads to resume performance of the terminal services. This demand was likewise rejected by the railroads. The sole reason offered by the railroads for refusal was that Army Base Piers Nos. 1 and 2 were now, in effect, "private" piers—that is, they were owned and operated by the shipper and owner of the freight, the United States Government—and that wharfage and handling were not customarily furnished at such piers. App. 341, et seq.

On April 15, 1944, the Government petitioned the Interstate Commerce Commission for a ruling that the railroads' actions violated the Interstate Commerce Act, in that they resulted in charges which were unreasonable, discriminatory and excessive, and constituted a denial of compensation for services rendered in connection with transportation. As relief, the Government asked for reparation in the amount of 1¢ per 100 lbs. for wharfage and 3¢ per 100 lbs. for handling on freight handled by the Army over its piers during its period of operation.

Division 2 of the Commission (one Commissioner dissenting) ruled in the Government's favor, reversing the trial examiner. United States v. Aberdeen & Rockfish R. Co., 263 I.C.C. 303. On reconsideration, however, the full Commission by a vote of seven to four reversed Division 2 and dismissed the Government's complaint. 264 I.C.C. 683. This decision was affirmed on reargument, six Commissioners adhering to the former ruling, with five now dissenting.[1] 269 I.C.C. 141. The Commission accompanied each decision with a full report, and as the second reaffirms the first we read the two together. They hold the contested charges to be reasonable, non-discriminatory, and otherwise in accordance with law.

## II.

To quote once more from the opinion of the Supreme Court, which is controlling here: "The basic question is whether railroads have illegally exacted sums of money from the United States." United States v. Interstate Commerce Commission, 337 U.S. 426, 430, 69 S.Ct. 1410, 1413, 93 L.Ed. 1451. In that connection, issues of reasonableness were presented "calling for exercise of the Commission's primary jurisdiction." 337 U.S. at page 437, 69 S.Ct. at page 1417. But the Government is entitled to judicial review of the Commission's order to determine whether it was entered "arbitrarily, without substantial supporting evidence", 337 U.S. at page 431, 433, 69 S.Ct. at page 1415, or "in defiance of law", 337 U.S. at page 433, 69 S.Ct. at page 1415, or "in defiance of standards established by Congress to determine when reparations are due", 337 U.S. at page 435, 69 S.Ct. at page 1415.

The difficulty of the task laid upon us as the reviewing court is heightened by the fact that this is the first reparation order (of either positive or negative character) to be accorded direct judicial review.[2] Nor are we assisted by any stat-

---

1. The fact that differences of opinion regarding the facts and the law existed within the Commission and its staff does not, of course, mean that the final order of the Commission is entitled to any less respect than it would possess had the issues been decided unanimously. Baltimore & O. R. Co. v. United States, 298 U.S. 349, 362, 56 S.Ct. 797, 80 L.Ed. 1209. On the other hand, decisions at every level become a part of the record and are properly before us on judicial review. Administrative Procedure Act,

§ 8(b), 5 U.S.C.A. § 1007(b); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 493, 71 S.Ct. 456, 95 L.Ed. 456. We have considered the entire record of the case in the course of our review, and have endeavored to give each portion of it "such probative force as it intrinsically commands." Universal Camera Corp. v. N. L. R. B., supra, 340 U.S. at page 495, 71 S.Ct. at page 468.

2. In the past, the only reparation decisions which have been subjected to any

ute expressly setting forth the standards of review which we are to apply in proceedings of the present sort. Our reading of the Supreme Court's earlier opinion in this case, however, leads us to conclude that we are to apply the standards of judicial review which are generally applicable to administrative action—the standards reflected in the Administrative Procedure Act, § 1 et seq. 5 U.S.C.A. § 1001 et seq., and in such decisions as Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 489, 62 S.Ct. 722, 86 L.Ed. 971; Gray v. Powell, 314 U.S. 402, 412, 62 S.Ct. 326, 86 L.Ed. 301; Rochester Telephone Corp. v. United States, 307 U.S. 125, 129, 59 S.Ct. 754, 83 L.Ed. 1147; and Chicago Junction Case, 264 U.S. 258, 265, 44 S.Ct. 317, 68 L.Ed. 667.

Such are the considerations which we have in mind as we examine the contentions of the parties and the findings and conclusions of the Commission. The Government urges two main grounds for its claim to reparation. First of all, it contends that the carriers by tariff undertook to furnish wharfage and handling at the piers in question, and that this obligation survived the cancelation of the lease to the Transport Trading & Terminal Corporation. According to the Government, it constituted a departure from filed tariffs (in violation of Section 6(7) of the Interstate Commerce Act) and an unjust and unreasonable practice (violative of Sections 1(5) and 1(6)) for the railroads to refuse either to perform the services or, in lieu of performance, to make an allowance in accordance with Section 15(13) by way of payment to the Government for performing the services itself.[3] In the second place, the Govern-

form of challenge in the courts have been those *granting* reparation. By statute, such an order is not a binding administrative determination, but is simply to be considered prima facie evidence of the findings embodied in it in an independent action at law against the carrier. Interstate Commerce Act, § 16(2), as amended, 49 U.S.C.A. § 16(2). Thus it happens that no such order has ever been subject to direct judicial review. No order *denying* reparation has (it seems) heretofore been reconsidered in any manner by any court. See, generally, Frankfurter, J., dissenting in United States v. Interstate Commerce Commission, 337 U.S. 426, 444–471, 69 S.Ct. 1410.

3. The pertinent language of the cited provisions is as follows:

§ 1(5) (a). "All charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful." 49 U.S.C.A. § 1(5).

§ 1(6). "It is made the duty of all common carriers * * * to establish * * * just and reasonable regulations and practices affecting classifications, rates, or tariffs * * * and all other matters relating to or connected with the receiving, handling, transporting, storing, and delivery of property * * * which

may be necessary or proper to secure the safe and prompt receipt, handling, transportation, and delivery of property * * upon just and reasonable terms, and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful." 49 U.S.C.A. § 1(6).

§ 6(7). "No carrier * * * shall engage or participate in the transportation of passengers or property, * * * unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this chapter; nor shall any carrier charge * * * a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith * * * than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs." 49 U.S.C.A. § 6(7).

§ 15(13). "If the owner of property transported * * * renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be published in tariffs * * * .

ment argues that quite aside from the tariff provisions it was unduly discriminatory for the carriers to refuse either to render the services or to make an allowance in lieu of performance in connection with traffic at the Army Base piers, while at the same time rendering them at other piers at Norfolk and elsewhere in connection with similar traffic. The Government denies that Army Base Piers Nos. 1 and 2 ceased to be "public" facilities when the Army took over their operation, and claims that the railroads subjected the traffic at these piers to undue prejudice, in violation of Section 2 of the Interstate Commerce Act, as amended, 49 U.S.C.A. § 2.

The Commission rejected the Government's contentions and based its denial of reparation on a number of conclusions, which may be summarized briefly as follows:

1. The railroads' tariffs imposed no obligation to provide wharfage and handling during the period of Government operation because:

(a) The tariffs relied on had no application to the Army Base piers after the Government took them over.

(b) The Government was not entitled to the export rates under the regular tariff provisions, but received such rates only by virtue of a special provision which contained no mention of accessorial port services.

2. Performance by the carriers of wharfage and handling services after June 1942 would have been "impractical," and the Army's election to carry on the work itself discharged any obligation resting on the carriers to render the services or to make an allowance therefor.

3. There was no undue discrimination, because the Army Base piers became private facilities when the Government took them over, and the railroads do not and need not absorb accessorial service charges at private piers.

4. There was no unjust enrichment to the railroads, because the over-all export rates which were paid were less than reasonable maxima.

We may now proceed to examine the legal and factual basis for each of these conclusions.

### III.

*The Survival of the Tariff Obligation.* Before the Army took over the operation of the Army Base piers, the railroads had absorbed wharfage and handling costs up to 4¢ per 100 lbs. under appropriate provisions in their tariffs. It is now controverted whether this tariff obligation survived the cancellation by the Government of the Transport Trading & Terminal Corporation's lease and the taking over of the piers by the military. The disputed provision (as contained in the tariff of the Virginian Railway) reads as follows:

"At Lincoln Tidewater Terminals, Inc., Transport Trading and Terminal Corporation, or Southgate Terminal Corporation (Portsmouth Division Terminal).

"Wharfage, handling and terminal charges, as published in Norfolk and Portsmouth Belt Line Railroad Tariff No. 6-J, I. C. C. No. 105 will be included in the transportation rates applicable to or from Norfolk, Va., on the following traffic moving in connection with the Virginian Railway through the above terminals."

The meaning attached to this language by the majority of the Interstate Commerce Commission was that the wharfage and handling charges would be absorbed only when and where the named terminal companies were in operation; consequently the Commission was of the opinion that the provision became of no effect after the ousting of the Terminal Corporation. The United States disputes this construction, contending that the transportation rates covered charges for the services at designated piers, the piers being identified by the

and shall be no more than is just and reasonable, and the commission may, after hearing on a complaint or on its own initiative, determine what is a reasonable charge as the maximum to be paid

by the carrier or carriers for the services so rendered or for the use of the instrumentality so furnished, and fix the same by appropriate order * * *." 49 U.S.C.A. § 15(13).

names of the terminal companies then operating them. In the Government's view, changes in the terminal operators are of no significance.

At one time, the railroads themselves evidently intended the tariffs to convey the meaning ascribed to them by the Government: each time a different terminal company took over operation of the piers, the carriers, without changing their tariffs, continued to absorb the service charges, making appropriate payments to the new operator.[4] And in fact, if the absorption provision is to make sense, the tariff reference to the Transport Trading & Terminal Corporation must be read as a reference to its pier facilities. By the terms of that provision, wharfage and handling are covered "at" the Terminal Corporation and on traffic moving "through" this "terminal." As Commissioner Splawn says in his dissent, "A corporation may own, lease, or operate wharfage facilities, but certainly it is not a terminal, and traffic cannot be delivered at or through it." 269 I.C.C. at 148. A prospective shipper, reading the tariff provision, would assume that wharfage and handling charges would be absorbed at the pier facilities through which his export freight would move, regardless of any change in the identity of the operator.

■ "A rate tariff is in essence a statement by the carrier to possible shippers that it will furnish certain services under certain conditions for a certain price. When a tariff has become legally promulgated, it is binding upon both the carrier and any shipper taking advantage of it, and its terms (in essence) become, in such respects, the only contract between the two allowed by law. Since the tariff is written by the carrier, all ambiguities or reasonable doubts as to its meaning must be resolved against the carrier. Not only is this simply an application of the general rule as to construction of written contracts and instruments, but, when the place occupied by transportation and the situation of shippers are considered, it is particularly useful in application to tariffs. The construction should be that meaning which the words used might reasonably carry to the shippers to whom they are addressed." Union Wire Rope Corp. v. Atchison, T. & S. F. Ry. Co., 8 Cir., 66 F.2d 965, 966–967, certiorari denied 290 U.S. 686, 54 S.Ct. 122, 78 L.Ed. 591.[5]

■ These settled rules were apparently not considered by the Commission, or at least not discussed in its reports. We think it should have considered them. We think also that the mere fact, on which the majority relied, that the tariffs nowhere mention the Army Base piers by that name is insufficient in itself to support the Commission's conclusion in the face of the countervailing evidence appearing of record.

The members of the Commission majority also concluded that under a limitation contained in the regular tariff provision just discussed, the Government would not have been entitled to the lower shipside export rates after it assumed control of the piers, because from then on it received possession of its freight from the railroads before the freight actually reached the piers. They reasoned that it was by virtue of a special tariff provision not mentioning wharfage and handling that the Government received the export rates,[6] and that

---

4. "Defendants themselves must have so interpreted the tariffs when they paid allowances to the Norfolk Tidewater Terminals, Inc., from September 1, 1925 [when that company went into possession], to December 1925, and later dates, although its name was not then mentioned in the tariffs." Commissioner Splawn, dissenting, 269 I.C.C. at 148. See also Report of Division 2, 263 I.C.C. at 312; Ex. 4, App. 451.

5. It is well settled that tariff provisions are to be construed strictly against the carrier, and any doubt resolved in favor of the shipper. Chicago & N. W. Ry. Co. v. Wilcox Co., 7 Cir., 68 F.2d 883, certiorari denied 293 U.S. 560, 55 S.Ct. 72, 79 L.Ed. 661. See, also, Raymond City Coal & Transportation Corp. v. New York Cent. R. Co., 6 Cir., 103 F.2d 56, 57; Southern Pacific Co. v. Lothrop, 9 Cir., 15 F.2d 486, certiorari denied, 273 U.S. 742, 47 S.Ct. 336, 71 L.Ed. 869.

6. "Export rates will also apply on shipments consigned on bills of lading for ex-

consequently it was not entitled to have the carriers absorb terminal charges. The Commission said in its report on reargument:

"The export rates * * * apply only 'On traffic which does not leave the possession of the inland carrier until delivered to the ocean carrier or its agent * * *.' Subsequent to June 15, 1942, this provision would have prevented the application of the export rates on freight handled through the Army Base, because that traffic 'would leave the possession of the inland carrier' when delivered to the complainant [the Government]. At the insistence of the complainant, therefore, the defendants included a provision in the tariffs to the effect that the export rates would apply also on shipments consigned to the United States Government and handled through Navy Bases, Navy Yards, or Army Bases for export to foreign countries. By reason of this provision the carriers apply the export rates on traffic moving over the Army Base Piers 1 and 2. There is nothing in the tariffs, however, that requires the defendants to pay the complainant an allowance for wharfage and handling traffic through the Army Base at Norfolk. The provision makes the export rates, but not the absorption arrangement, applicable. As

the defendants rightly argue, the granting of one concession does not necessarily require another to the same party. The allegation of a section 6 violation is not sustained." 269 I.C.C. at 143.

In our view, the conclusions just stated are untenable on the present record. In the first place the customary tariff provision,[7] applying export rates only to freight remaining in the railroad's possession until delivery to the ocean carrier, was clearly a policing measure designed to prevent shippers of domestic freight from obtaining the lower export rate by misrepresentation or chicanery. Where satisfactory proof of exportation is given, freight which does leave the possession of the railroads is entitled under the tariffs to the export rates.[8] The military shipments involved in this controversy were, as the Commission said, "almost entirely outbound." 264 I.C.C. at 684. See App. 114, 166, 224, 328–29. Failure by the carriers to accord export rates to these shipments, after due showing of exportation, would have been prima facie unreasonable and discriminatory.[9] Thus the special tariff provision to which the Commission refers as a "concession" is not a concession at all. It is simply a recognition of the obvious export character of this freight and serves to remove any notion that the Government

port, destined to foreign countries or foreign possessions of the United States, handled through United States Navy Yards, Naval Bases or Army Bases or delivered to United States Government vessels docked thereat on presentation of proper evidence of exportation." Ex. 3, App. 368, 379.

7. See, for example, Ex. 3, App. 367, 371, 380.

8. The tariffs provide that export rates shall apply "also on traffic delivered to the party entitled to receive it at the carrier's seaboard stations to which export rates apply which traffic is handled direct from carriers' stations to steamship docks and on which required proof of exportation is given." Ex. 3, App. 367–68. See also Ex. 3, App. 371, 380.

9. In similar contexts, the Commission has consistently held that shippers are entitled to export rates even though war-

time conditions prevent observance of carriers' policing rules, when the facts show bona fide export traffic. Gulf Carloading Co. v. B. & O. R. Co., 266 I.C.C. 283; Products-From-Sweden, Inc. v. Lehigh Valley R. Co., 263 I.C.C. 760. In the latter case it is aptly said: "Rules which are just and reasonable in peacetime are not necessarily just and reasonable under conditions resulting from the war. In our opinion the failure of defendants to make appropriate changes in their rules resulted in application of unreasonable charges on these shipments." 263 I.C.C. at 763. See also Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 527, 31 S.Ct. 279, 55 L.Ed. 310. A like approach requires that the Government be accorded export rates on the goods here involved, and that those export rates be accorded on the same basis to the Government as to other shippers.

was to be required to pay the higher domestic rates on shipments of war materiel.

In any event, this provision in terms made the rates contained in the export tariff schedules applicable to the Government shipments passing through Army Base Piers Nos. 1 and 2. A rate is by definition an announcement that stated services will be accorded for a stated charge. Thus on the face of the tariff the Government was entitled to any and all ancillary services or facilities which, by the tariffs, were included under the rates: the Government was to receive no less than a private shipper would receive on commercial export freight. The record contains no support for the conclusion that, simply because these shipments received the export rates by virtue of the special tariff provision, they were not entitled to receive all the services ordinarily covered by those rates.

We recognize that the Commission's views as to questions of law arising in the course of its duties are entitled to very great weight, Medo Photo Supply Corp. v. Labor Board, 321 U.S. 678, 681, 64 S.Ct. 830, 88 L.Ed. 1007, and in the construction of tariffs there are many practical reasons for according a high degree of finality to its determinations. But there are occasions even in this field where the courts are required to apply "the fixed law to the established fact", Pennsylvania R. Co. v. International Coal Co., 230 U.S. 184, 197, 33 S.Ct. 893, 896, 57 L.Ed. 1446; Great Northern R. Co. v. Merchants Elev. Co., 259 U.S. 285, 290, 294, 42 S.Ct. 477, 66 L. Ed. 943; B. & O. R. Co. v. Brady, 288 U. S. 448, 456–457, 53 S.Ct. 441, 77 L.Ed. 888. Cf. Stark v. Wickard, 321 U.S. 288, 310, 64 S.Ct. 559, 88 L.Ed. 733; Interstate Commerce Commission v. Union Pacific R. Co., 222 U.S. 541, 547, 32 S.Ct. 108, 56 L.Ed. 308. We are of the view, for the reasons stated, that the present record does not adequately support the Commission's conclusion that the tariffs no longer covered terminal services at the Army Base piers after the Government took over their operation. The determination must therefore be set aside. The question of further proceedings in this regard is discussed in the concluding portion of this opinion.

## IV.

*The Scope of the Tariff Obligation —Practicality.* If the tariffs continued to provide for the absorption of wharfage and handling by the carriers, the law required that the Government be accorded whatever benefits fell within the proper scope of this provision. Interstate Commerce Act § 6 (7), as amended, 49 U.S.C.A. § 6(7). But the Commission not only found that the absorption provision became inapplicable, but concluded on another ground that the obligation embodied in it was discharged after June 15, 1942. The majority found that operation of the piers after that date by anyone but the Army would have been "impractical," 264 I.C.C. at 686, and that the carriers "would not have been able to continue the work done formerly by the Transport Trading and Terminal Corporation at their convenience and to the satisfaction of the complainant." 269 I.C.C. at 144. The majority was of the opinion that therefore, when the Government took over the piers, the carriers were relieved of any duty imposed by the tariffs to furnish the services or to pay the Army for performing them. The report on re-argument reasoned thus:

"In *Propriety of Operating Practices—Terminal Services,* 209 I.C.C. 11, 29, we said that 'When a carrier is prevented from performing the service (car spotting for delivery) by the election of the industry to perform it, and when the service of the carrier would not meet the needs and convenience of or be satisfactory to the industry, the carrier's duty to perform the service under the line-haul rates is discharged, and there is no obligation resting upon it to make an allowance to the industry for performing the service.' The complainant [the Government] argues that this principle is not applicable to the instant proceeding as a different factual situation exists. We believe that our pronouncement may well be applied here. Although after June 15, 1942, the Transport Trading and Terminal Corporation had no facilities or terminals at the Army Base, it was the defendants' [the rail-

roads'] duty, under their line-haul rates, to place properly the complainant's cars for loading and unloading, and in the circumstances they discharged that obligation when they placed the cars in the complainant's storage yard adjacent to the piers." 269 I.C.C. at 144.

There can be no doubt that the Army took over operation of the piers because the military authorities considered that the freight could thus be better handled in accordance with their needs. Close Army supervision of the piers was in all likelihood a matter of military necessity. But it does not follow from this that private operation under Army direction was "impractical," or that, with proper organization, service satisfactory to the military could not have been arranged. In fact, when the railroads rejected the Government's request that the terminal services be furnished, they did not cite as their reason the impracticability or difficulty of performing the services at the Army Base piers. They made no attempt to confer with the military authorities to discover whether or not performance by the railroads could be arranged. Rather, they flatly refused to perform on the ground that it was not their custom to furnish wharfage and handling at "private" piers, which they now considered the Army Base facilities to be.

We find little in the record which would sustain a conclusion that no satisfactory arrangement could possibly have been worked out, even after fair and honest effort. As already pointed out, the Army operated the piers with basically the same organization as the Terminal Company had used, supplemented when necessary by military personnel. Moreover, other piers at Norfolk and elsewhere, whose main traffic was war materiel, continued under private operation throughout the war.[10] Although it is true that some strain would have been placed on any operator at these piers, this was an inevitable result of wartime conditions, and we suppose that in its own interest the Army would have done all in its power to eliminate difficulties. Congress foresaw that the exigencies of war would impose a strain on transportation facilities. By Section 6(8) of the Interstate Commerce Act the legislature directed the railroads to "adopt every means within their control to facilitate and expedite the military traffic." 49 U.S.C.A. § 6(8). Those means were indicated by the Commanding General of the Hampton Roads Port of Embarkation when he demanded of the railroads that they perform their tariff undertakings. Disruption of business and commercial life was common at this time throughout the economy. Materials were rationed, production controlled, prices and profits limited. The burden cast upon the railroads here seems light indeed by comparison.

But even assuming that performance by the carriers would not have been "practical"—that no arrangement satisfactory to the Army could have been worked out—the carriers' inability to perform would not of itself release them from their tariff obligation. As we have seen, the Commission cited the rule established by it in *Propriety of Operating Practices—Terminal Services*, 209 I.C.C. 11, 29, in support of its holding that the carriers' duty to perform the service was discharged and that there was no obligation resting upon them to make an allowance for performing the service. The principle of the *Operating Practices* case, however, was designed in terms to control rebating and rendition of gratuitous services, not included in the tariff or in the common carrier obligation, under the guise of providing legitimate transportation service. It was not intended to relieve the railroads from providing or paying for facilities and services included in their tariff obligation—that is,

---

10. The Commission's conclusion that "Troops would have had to be used, and obviously anything but operation by the complainant [the Government] was impractical" may be compared with Division 2's unchallenged finding that at the United Nations and Lambert Point piers at Norfolk (where an allowance was made by the carriers) handling services were performed by both civilian and military personnel under the supervision of civilian contractors. 263 I.C.C. at 306–07; 264 I.C.C. at 678.

services paid for by the shipper as part of the line-haul rate.

The Commission gives no valid reason why "impracticality" excuses such a departure from the filed tariffs and immunizes it from the prohibition of Section 6(7) of the Interstate Commerce Act. That provision on its face appears to forbid departures of any sort. Nor does the Commission explain—except by the reference to the *Operating Practices* case just considered—why the difficulties involved in performance should be conclusive in the face of the Government's initial willingness to perform for itself and accept an allowance from the carriers.

■ Special consideration is required in connection with the period from June 15, 1942, when the Army took over the piers, until May 1, 1943, when the military first requested that the carriers resume performance of the terminal services. During this period, the Army had control of the wharves, and the railroads were consequently prevented from performing. Under some circumstances, such intervention by a shipper might discharge not only the carrier's duty of performance but also any obligation to make an allowance in lieu of

performance. In the present case, however, we are not persuaded that the Government's voluntary undertaking of the terminal services operated to excuse the carriers. We do not have here the case of a shipper preventing performance by a willing carrier. Almost from the start, the railroads manifested an unwillingness to continue performance.[11] In refusing the Government's request for an allowance, they gave as their only reason their view that the Army Base piers had become "private" facilities at which no terminal services were due. Clearly, they considered themselves no longer under any obligation to furnish wharfage and handling.[12]

Nor did the Government's action, taken in an emergency to assure a smooth flow of war materiel, increase the cost to the railroads or inconvenience them in any way. (The carriers contend, on the contrary, that performance by them would have been impractical.) Moreover, had private operation continued, the Army could still have controlled the piers and the shipments passing over them by the use of military priorities and routings. See Interstate Commerce Act § 6(8), as amended, 49 U.S.C.A. § 6(8). Realistically, so far as the railroads are concerned, the Government merely aug-

11. The Interstate Commerce Commission appears to have ignored this fact. However, it provides another significant difference between the Operating Practices decision (and others which the carriers cite) and the case at bar. The passage quoted from the Operating Practices case, 209 I.C.C. 11, 29, and relied on by the Commission, was itself paraphrased from the opinion in Allowances to Texas Gulf Sulphur Co., 96 I.C.C. 371. An allowance for ancillary services was denied in that case, but on a basis which clearly distinguishes it from the case at bar, the Commission saying:

"There is nothing of record to indicate that the Santa Fe was not willing to continue to perform the service or that complainant has since that time ever requested the Santa Fe again to perform such service. On brief and argument counsel for the Santa Fe stated that it has always been ready and willing to perform the service but has been prevented from so doing by complainant." 96 I.C.C. at 375.

12. Despite this attitude, the railroads now argue that, if any obligation rested on them, they were entitled to perform the services and could not be required to pay the Army instead when the Army undertook performance. The proposition may be sound when applied to services forming a part of transportation which common carriers must by law perform for all comers. Atchison, T. & S. F. Ry. Co. v. United States, 232 U.S. 199, 34 S.Ct. 291, 58 L.Ed. 568. It would be unfair and uneconomic to compel railroads to offer certain services and yet allow shippers at their own election to intervene in their performance. The situation is different in the case of ancillary obligations voluntarily undertaken by tariff, for there the railroads can unburden themselves of the duty if the need arises, simply by amending the tariffs. Consequently, carriers may not insist on the right to perform non-transportation services such as are involved in the present case. Atchison, T. & S. F. Ry. Co. v. United States, supra. Whether they can insist that when others perform them they do so free of charge is the question here.

mented the facilities and personnel of the Transport Trading & Terminal Corporation. All the Government now asks is that the railroads pay it for wharfage and handling what they would have paid the Terminal Corporation for performing these services under close Army supervision. What the railroads seek is the retention of money which they would have been obliged to disburse to the Terminal Corporation, had the war not led the Army to assume operation of the piers.

We do not think the Government's election to provide services which the carriers subsequently showed themselves unwilling to render necessarily discharged the obligation undertaken in the tariffs. "On the contrary, the act of Congress in terms contemplates that if the carrier receives services from an owner of property transported, or uses instrumentalities furnished by the latter, he shall pay for them. That is taken for granted in § 15 [of the Interstate Commerce Act];[13] the only restriction being that he shall pay no more than is reasonable, and the only permissive element being that the Commission may determine the maximum * * *." Interstate Commerce Commission v. Diffenbaugh, 222 U.S. 42, 46–47, 32 S.Ct. 22, 24, 56 L.Ed. 83. "The shipper was * * * entitled, under the plain terms of Sec. 15 (13), to be paid by the carrier a just and reasonable allowance for providing the facility." General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 431, 60 S.Ct. 325, 330, 84 L.Ed. 361. The contention that Section 15(13) simply imposes a ceiling on allowances but does not require reimbursement of a shipper for services in connection with transportation which he elects to perform primarily for his own convenience was answered by this court in United States ex rel. Members of Waste Merchants' Ass'n of New York v. Interstate Commerce Commission, 51 App.

D.C. 136, 140, 277 F. 538, 542, reversed on other grounds 260 U.S. 32, 43 S.Ct. 6, 67 L.Ed. 112. We there said:

"* * * the carrier, receiving from the shipper services which under the carrier's tariff schedules, it was obligated to perform, should in fairness be compelled to make reasonable allowance therefor—and this, as we read its decisions, is what the Supreme Court has held [to be the requirement of section 15(13)]. * * * [Under the facts presented] the shipper was 'entitled to demand a compensation reasonably commensurate with the facilities furnished and the services performed.' United States v. Balt. & Ohio R. R. Co., 231 U.S. 274, 293, 34 S.Ct. 75, 81, 58 L.Ed. 218." [14]

We do not think the record bears out the finding of the majority of the Commission that operation by the carriers would have been "impractical"; we do find substantial support for Division 2's conclusion that "If the Army had not taken its property, the terminal company, with proper organization, could have continued the operation." 263 I.C.C. at 308. But in any event, the Commission has not shown us why the difficulty—or even impossibility—of arranging for service satisfactory to the Army would, under the circumstances here presented, relieve the carriers of the obligation to render services covered by their tariffs or to make an allowance pursuant to Section 15(13) when the Government undertook to perform the services itself. For the reasons stated, we find no adequate support in the record for the Commission's ruling that no such obligation to perform or pay existed after June 15, 1942. Section 6(7) of the Interstate Commerce Act prohibits a railroad from making a charge different from that provided by tariff,[15] and it may be violated by a fail-

13. The pertinent provisions of Section 15 are quoted in footnote 3, supra.

14. Cf. Fulton Bag & Cotton Mills v. American Railway Express Co., D.C.N.D.Tex., 288 F. 854.

15. We note that whereas certain of the Act's prohibitions apply only to practices found "unreasonable" by the Commission, Section 6(7) is aimed at any and all departures from published tariff rates, reasonable or not. See Mitchell Coal & Coke Co. v. Pennsylvania R. Co., 230 U.S. 247, 260–261, 33 S.Ct. 916, 57 L.Ed. 1472; Pennsylvania R. Co. v. International Coal Co., 230 U.S. 184, 196–197,

ure to furnish or pay for valuable services covered by the line-haul rates—just as it may be by the performance without charge of services not so covered. See United States v. Wabash R. Co., 321 U.S. 403, 64 S.Ct. 752, 88 L.Ed. 827. In our view, therefore, the Commission's holding that there was no violation of Section 6(7) lacks an adequate factual and legal basis, and cannot stand on the present record.[16]

## V.

*The Issue of Discrimination.* Section 2 of the Interstate Commerce Act forbids discrimination among shippers by means of "any special rate * * * or other device". The Government complains that the railroads violated this prohibition —quite apart from any tariff provision—by denying it facilities accorded to shippers at other piers. The Commission held that though there was discrimination, this was not unlawful. It found that wharfage and handling were commonly covered in the line-haul rates at what are termed "public" piers but not at those termed "private," that this was a justified discrimination, and that the Army Base piers fell within the "private" classification during the Government's period of operation.

In support of this phase of the Commission's ruling, stress is placed upon the decision of Division 4 in Weyerhaeuser Timber Co. v. Pennsylvania R. Co., 229 I.C.C. 463. There a refusal to offer at a certain pier terminal services furnished at other piers in the same port was found to be lawful. But although the report in that case discussed the differences between public and private piers, it is clear that the decision did not rest on that distinction: the Commission expressly found that the pier where the services were denied, as well as those at which they were provided, was a public terminal. 229 I.C.C. at 476. The main circumstance held to justify the denial of the services was that the railroads incurred a trackage charge of fifty cents per ton at the pier in question but not at others. Thus Weyerhaeuser is hardly a determinative precedent.

We do not conclude, however, that as a general rule some form of distinction between public and private facilities would be legally unsound, or that considerations such as those discussed in the Weyerhaeuser report would be an improper basis for such a distinction. A shipper choosing to maintain and operate a pier for its own freight may not generally be entitled to demand an allowance from a rail carrier for wharfage and handling. But in the present case the considerations emphasized in Weyerhaeuser are conspicuously absent, and the record does not support a finding that the Army Base piers were "private" as that term is normally used in this field. See 229 I.C.C. at 473–74. The Government's shipment of freight over its own piers was not a mere matter of commercial convenience or advantage; it was dictated by the fact that the other facilities owned by the carriers at the port of Norfolk could not have accommodated the vast volume of military traffic. 264 I.C.C. at 688; App.182–91. Requiring the railroads to provide wharfage and handling at the Army Base, or to make an allowance therefor, would not have compelled the railroads to forego any economy (such as that flowing from large scale operations) enjoyed by them prior to June 15, 1942. Finally, these piers had long been treated as public facilities by the carriers, and even during the war they remained open to such general commercial traffic as could be fitted into the scheduling of military shipments. App.121–23.[17]

33 S.Ct. 893, 57 L.Ed. 1446. See also B. & O. R. Co. v. Brady, 288 U.S. 448, 456–457, 53 S.Ct. 441, 77 L.Ed. 888.

16. At various times after June 15, 1942, certain of the railroads eliminated from their tariffs the references to the Army Base piers. So far as appears from the record, this action was taken without conformance to the provisions of the Interstate Commerce Act relating to tariff amendments. See 49 U.S.C.A. § 6(3). We express no opinion as to whether

these tariff changes were effective to terminate any earlier violations of Section 6(7), and whether they affected the reasonableness under Sections 1 and 2 of the carriers' refusal to provide or pay for wharfage and handling. These issues were not raised before us, and their resolution would not control our disposition of this appeal.

17. Adopting an approach similar to ours here, Division 2 has ruled that piers of established public character, when used

If the discrimination is to be justified, then, it must be on some basis other than the public-private distinction drawn by the Commission in Weyerhaeuser. It is not incumbent upon this court to decide in the first instance whether any such basis exists, and we make no ruling on the legality of the discrimination. Discrimination is forbidden by the Interstate Commerce Act only where the service, traffic and circumstances are substantially similar. Interstate Commerce Act § 2, as amended, 49 U.S.C.A. § 2. In the present case, on re-examination of the matter, the Commission might find that the circumstances obtaining at the Army piers and at the docks where the carriers did furnish wharfage and handling were different in significant respects, so as to legalize discrimination. This of course would not excuse any failure by the railroads to live up to the obligations undertaken in their tariffs or imposed by other provisions of the Act. Nor would it defeat any liability on their part to make reparation on that account.

## VI.

*The Over-All Reasonableness of the Charges.* In denying the Government reparation, the Commission referred to the fact that, in its view, the freight charges paid by the Government were below the reasonable maximum rates, even after elimination of the terminal services. It found "that the line-haul rates charged on this traffic were and are less than reasonable maxima, and that nothing has been added to them to cover the cost of wharfage and handling. * * *." Consequently, "as nothing has been added * * * to cover the wharfage and handling they are not above a reasonable maximum level when a reasonable charge for wharfage and handling is added. This being true, an order directing the defendants [railroads] to pay the complainant [Government] reparation in the amount of the aforementioned wharfage and handling charge would make the export rates just that much below the upper limit of reasonableness." 269 I.C.C. at 145, 147.

The Commission does not state in its reports what bearing, if any, it considers the over-all reasonableness of the rates to have upon the Government's right to reparation, under the remedial provisions of Sections 8, 9, and 16(1) of the Act, 49 U.S.C.A. §§ 8, 9, 16(1), for denial of an allowance under Section 15(13) or for violations of Sections 1, 2 or 6(7).[18] The railroads, however, argue that the finding of over-all reasonableness constitutes a complete bar. The Government's claim, they say, is founded on the view that the carriers exacted excessive charges and were unjustly enriched as a result. The carriers' contention is that the over-all charges were reasonable, and that consequently there could be no unjust enrichment and no basis for the Government's complaint.

We think this contention of the carriers is much too sweeping. It would appear entirely inconsistent with the statutory scheme to require that before a shipper can recover reparation for any breach of a railroad's duty he must show that the total amount he paid was in excess of reasonable maximum rates. Sections 8, 9 and 16(1) on their face provide damages for violations of each of the statutory prohibitions. The effect of these remedial provisions would be vitiated if a shipper could not recover by showing a departure from

primarily for military purposes during wartime, do not for that reason become "private" in any sense which would entitle the carriers to withdraw loading and unloading services offered by published tariffs, or permit them to eliminate the tariff provisions. Elimination of New York, N. H. & H. R. Pier Stations, 255 I.C.C. 305. We may add that, conversely, performance of terminal services by the railroads at military docks does not establish a precedent entitling operators of purely private piers to demand an allow-

ance for equivalent services. The Government's position in such cases is unique, and private pier operators could not satisfy the criteria of a "public" pier set out by the Commission in the Weyerhaeuser case. 229 I.C.C. at 473–76.

18. The brief filed in the Commission's behalf in this court does say that "the Commission, acting on the ground of unreasonableness, is without authority to order action having the effect of reducing rates already well below the level of reasonable maxima." Br. 29.

published rates (Section 6(7), or an illegal discrimination (Section 2), rebate (Section 2), or preference (Section 3), but had in each case to prove also a breach of the duty to charge no more than reasonable rates (Section 1).[19] Moreover, the carriers' approach would also permit a collateral attack on filed tariffs. Here a shipper alleges that an objectionable practice constitutes a departure from the tariff rates. If the railroads may defend on the ground that a higher rate might have been published, the result would in effect be an *ad hoc* amendment of the tariff. This would be inconsistent with Section 6(3) of the Interstate Commerce Act, 49 U.S.C.A. § 6(3), which prescribes procedures to be followed in securing a tariff amendment. Compare Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348.

Great Northern Ry. Co. v. Sullivan, 294 U.S. 458, 55 S.Ct. 472, 79 L.Ed. 992, on which the railroads place some stress, has no bearing on the problems we are considering. That decision dealt with the complaint of a shipper who had paid a joint rate to Great Northern and other railroads on a through bill of lading. The shipper did not challenge as excessive the total amount of the joint rate; he simply claimed that the fractional part received by Great Northern was unreasonable. The Supreme Court held that the shipper could not complain of the division of the charges among the participating carriers, and it was in this connection that the Court remarked that "The shipper's only interest is that the charge shall be reasonable as a whole." 294 U.S. at page 463, 55 S.Ct. at page 475. The differences between Great Northern and our case—and the inapplicability here of the quoted statement—are apparent. The

carriers in Great Northern had fully performed their tariff obligations and the shipper was seeking to modify the manner in which they divided the resulting charges among themselves. In the case before us, the shipper has not received the promised services. It has performed for itself and at its own expense services listed in the railroads' tariffs, and it seeks compensation which the railroads formerly paid to a terminal operator. The Great Northern decision can have little application in such a situation.

For these reasons, the Commission's finding that the rates remained reasonable after elimination of wharfage and handling—assuming that finding to be soundly based [20]—cannot be given the all-inclusive and all-conclusive effect for which the railroads argue. True, under Section 15(13) an allowance may not be greater than the Commission determines to be "just and reasonable". And under other provisions of the Act, the complaining shipper must not only convince the Commission of the unreasonableness of the challenged practices or the discriminatory character of the challenged rates, but must also show an actual pecuniary loss before reparation will be awarded. Interstate Commerce Commission v. United States ex rel. Campbell, 289 U.S. 385, 53 S.Ct. 607, 77 L.Ed. 1273; Davis v. Portland Seed Co., 264 U.S. 403, 44 S.Ct. 380, 68 L.Ed. 762. These statutory provisions no doubt give wide authority to the Commission to consider the circumstances of each case. But they must be read in the light of Section 8, which requires the Commission to award "the full amount of damages sustained in consequence of any * * * violation" of the Act. Interstate Commerce Act, § 8, as amended, 49 U.S.C.A. § 8; Meeker & Co. v.

---

19. Heretofore, shippers deprived of allowances have not been required to show that the charges actually paid were above the reasonable maximum rates in order to establish a right to reparation. See Interstate Commerce Commission v. Diffenbaugh, 222 U.S. 42, 32 S.Ct. 22, 56 L.Ed. 83; Union Pacific R. Co. v. Updike Grain Co., 222 U.S. 215, 32 S.Ct. 39, 56 L.Ed. 171; General American Tank Car Corp. v. El Dorado Terminal

Co., 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361; cf. Central Railroad Co. of New Jersey v. United States, 257 U.S. 247, 255, 257–258, 42 S.Ct. 80, 66 L.Ed. 217; Interstate Commerce Commission v. Mechling, 330 U.S. 567, 582–583, 67 S.Ct. 894, 91 L.Ed. 1102. In each of these cases, the shipper's rights were determined without regard to the level of the rates paid on the traffic.

20. See footnote 23, infra.

Lehigh Valley R. Co., 236 U.S. 412, 429, 35 S.Ct. 328, 59 L.Ed. 644. That mandate remains despite a finding that the charges were not greater than the reasonable maximum rates.

■ At best, the over-all reasonableness of the charges paid is one of several factors to be weighed in determining whether a carrier has violated the Act and, if so, whether the shipper has suffered a loss entitling him to reparation.[21] If the rates are unreasonable, a violation is established and actual loss need not be specifically proved. Adams v. Mills, 286 U.S. 397, 52 S.Ct. 589, 76 L.Ed. 1184.; Louisville & Nashville R. Co. v. Sloss-Sheffield S. & I. Co., 269 U.S. 217, 46 S.Ct. 73, 70 L.Ed. 242; Southern Pacific Co. v. Darnell-Taenzer Co., 245 U.S. 531, 534, 38 S.Ct. 186, 62 L. Ed. 451. If they are reasonable, however, recovery is not precluded: damage specifically established can be recovered, if it flows from a violation of the Act. Interstate Commerce Commission v. United States, 289 U.S. 385, 53 S.Ct. 607, 77 L.Ed. 1273; Davis v. Portland Seed Co., supra. The fact that no excessive charge has been exacted may be relevant in establishing the absence of a violation or the absence of damage; it certainly is not conclusive.

## VII

Applying the tests laid down for us by the Supreme Court at an earlier stage of this litigation, we have concluded—for the reasons and in the respects indicated above

—that certain of the Commission's findings in this case lack "substantial supporting evidence," and that certain of its legal conclusions are opposed to the "standards established by Congress to determine when reparations are due." United States v. Interstate Commerce Commission, 337 U.S. 426, 433, 435, 69 S.Ct. 1410, 1415, 93 L.Ed. 1451. The Commission's order of July 25, 1947, must therefore be set aside. Cf. Securities & Exchange Commission v. Chenery Corp., 318 U.S. 80, 88, 94, 95, 63 S.Ct. 454, 87 L.Ed. 626. The Commission may hereafter take such further proceedings as may be appropriate, consistent with this opinion. Cf. State of Florida v. United States, 282 U.S. 194, 215, 51 S.Ct. 119, 75 L.Ed. 291; Eastern-Central Motor Carriers Ass'n v. United States, 321 U.S. 194, 210, 64 S.Ct. 499, 88 L.Ed. 668; Securities & Exchange Commission v. Chenery Corp., 332 U.S. 194, 201, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995.

■ When and if the Commission reexamines the Government's complaint in the light of the present opinion, it will approach anew the question of the construction of the tariffs,[22] as well as such further questions as the amount of the allowance due under Section 15(13), if any, and the reasonableness of the carriers' nonpayment for the Government's performance of the terminal services, both before and after the elimination of the piers from the tariff schedules.[23] It will also have to determine

---

21. It may, for example, be relevant to a determination concerning the reasonableness of practices challenged under Sections 1(5) or 1(6) of the Interstate Commerce Act, and yet be quite irrelevant to the assessment of reparation to be paid for violations of Sections 6(7) or 2. We leave these questions open.

22. As to this, we think the Commission should expressly consider, and determine the weight to be given to, the principles expressed in the Union Wire Rope case, supra, and the cases cited in note 5, supra.

23. In this connection, we think the Commission should (if it finds the matter relevant to its decision) re-examine the reasons it has given for its conclusion that the charges paid by the Government

were below the reasonable maxima. One ground was that these charges were less than the domestic rates, which do not cover accessorial services. But the reasonableness of an export rate cannot be determined simply by comparing it with domestic rates, since the former, in order to move traffic, must be fixed on the basis of export rates through competitive ports—a consideration irrelevant to the fixing of domestic rates. See Texas & Pacific Ry. Co. v. United States, 289 U.S. 627, 635, 53 S.Ct. 768, 77 L.Ed. 1410; Albany Port District Comm. v. Ahnapee & Western Ry. Co., 219 I.C.C. 151, 163–65; Livestock—Western District Rates, 176 I.C.C. 1, 82–83; cf. Virginian Ry. Co. v. United States, 272 U.S. 658, 47 S.Ct. 222, 71 L.Ed. 463. The second argument advanced to show

the extent of the Government's loss flowing from any violation of the Act of which it finds the carriers guilty. Its decision on these matters should be based on a "suitably complete statement" of its reasons for its conclusions, State of Florida v. United States, 282 U.S. 194, 215, 51 S.Ct. 119, 125, 75 L.Ed. 291, and its findings should show the propriety, "from the standpoint of justice and law, of the step asked to be taken", Akron, C. & Y. R. Co. v. U. S. (New England Divisions Case), 261 U.S. 184, 200, 43 S.Ct. 270, 277, 67 L.Ed. 605.

The judgment of the District Court will accordingly be

Reversed.

WILBUR K. MILLER, Circuit Judge (dissenting).

In my opinion the judgment of the District Court should be affirmed on the basis of the opinion written by Judge Morris, 1950, 92 F.Supp. 998.

that the charges remained reasonable after wharfage and handling were eliminated is based on the conclusion that the export rates had not previously included any sum as a charge for these services. This argument implies that the services were rendered free by the carriers, a procedure whose legality may be seriously questioned. See United States v. Wabash R. Co., 321 U.S. 403, 64 S.Ct. 752, 88 L.Ed. 827; Baltimore & O. R. Co. v. United States, 305 U.S. 507, 59 S.Ct. 284, 83 L.Ed. 318. Actually, however, nothing in the record indicates that the overall rates did not cover the costs of all services, or that wharfage and handling were in any realistic sense provided free.

The fact that no segregated charge for wharfage and handling was published in the tariffs separate from the line-haul charge may mean no more than that the carriers wished to include the services in the *quid pro quo* offered in the export tariffs as a means of attracting traffic. *Compare* Charges for Wharfage, Handling, Etc., 157 I.C.C. 663. Furthermore, in considering the question of the overall reasonableness of the rates, the Commission should canvass the relevancy of such matters as the effect of the elimination of the services on the movement of traffic, on railroad profits, on the competitive structure, and the like.