**PENNSYLVANIA RAILROAD COMPANY, a Corporation, Plaintiff-Respondent,**

v.

**CHROMCRAFT CORPORATION, a Corporation, Defendant-Appellant.**

No. 32842.

St. Louis Court of Appeals.

Missouri.

Dec. 19, 1967.

Motion for Rehearing or to Transfer to Supreme Court Denied Jan. 18, 1968.

Hocker, Goodwin & MacGreevy, Edward K. Fehlig, St. Louis, for defendant-appellant.

Coburn, Craft & Kohn, Alan E. Popkin, St. Louis, for plaintiff-respondent.

DOERNER, Commissioner.

The plaintiff, Pennsylvania Railroad Company, instituted this action against the defendant, Chromcraft Corporation, in the Magistrate Court of the City of St. Louis to recover additional freight charges of $166.86. Plaintiff prevailed in the Magistrate Court, and again in the Circuit Court, where the parties waived a jury, and this appeal followed.

Most of the facts were stipulated and the remainder are uncontroverted. Defendant made five shipments of furniture which were carried by plaintiff from St. Louis to New York and there transferred to Bush Terminal Railroad, a connecting carrier. The latter carried the shipments to a track adjacent to the Brooklyn Army Terminal where the merchandise was delivered to the consignee, the Federal Government. Delivery was made outside of the Army Terminal because no common carrier, including Bush, was permitted by the government to operate within the terminal. The furniture was ultimately exported, and plaintiff's undisputed evidence was that the export rate was applied to all shipments consigned to the Brooklyn Army Terminal unless the shipper, at the government's direction, put a code designation on the bill of lading to indicate that the shipment was for domestic use or consumption. It is a fair inference that no such designation was inscribed on the bills of lading covering the shipments in question. Defendant paid the proper rate for domestic shipments but plaintiff claimed that it was entitled to the rate for export shipments, which was higher, the difference amounting to an additional $166.86.

The rates charged for interstate rail shipments are controlled by tariffs, published by the Interstate Commerce Commission, 49 U.S.C.A. § 1, et seq.; Chicago, Rock Island & Pacific R. Co. v Furniture

Forwarders of St. Louis, Inc., D.C.E.D. Mo., 267 F.Supp. 175, 176. Such tariffs have the same force and effect as a statute, and are binding on the carrier and the shipper alike. Pennsylvania R. R. Co. v. International Coal Mining Company, 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446. The determination of whether a rate is or will be reasonable or otherwise in violation of the Act is initially a matter to be determined by the Interstate Commerce Commission, whose determination is subject to judicial review. 49 U.S.C.A. § 15; United States v. Interstate Commerce Commission, 91 U.S.App.D.C. 178, 198 F.2d 958, cert. den. 344 U.S. 893, 73 S.Ct. 212, 97 L.Ed. 691. Where, however, the issue between a shipper and a carrier is not the reasonableness of a rate but only the construction or interpretation of a published tariff the courts, including a state court, may entertain jurisdiction. Great Northern Ry. Co. v. Merchants' Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943; Milne Lumber Co. v. Michigan Cent. R. Co., Mo.App., 57 S.W.2d 732; Sunderland Bros. Co. v. Baltimore & O. S. W. R. Co., 196 Mo.App. 154, 190 S.W. 650. Defendant in its brief expressly disclaims any contention that the export rate is unreasonable, and the parties both agree that the determination of their dispute depends entirely upon the construction of Item 3210–G of Tariff 490–B of the Central Territory Railroad Bureau, of which plaintiff is a member. Considering the amount involved, we accordingly have jurisdiction. Milne Lumber Co. v. Michigan Cent. R. Co., supra; Sunderland Bros. Co. v. Baltimore & O. S. W. R. Co., supra.

Item 3210–G of Tariff 490–B is headed "Application of Export Rates to North Atlantic Seaboard Ports of Export or Trans-Shipment," and so far as here pertinent reads:

"The rates named in this tariff, or as same may be amended, and designated as 'Export Rates' will apply on property for export when exported direct from port stations named in this tariff, or as same may be amended and will only apply, except as otherwise provided herein, on traffic which does not leave the possession of the carrier, and is delivered by the Atlantic Port Terminal Carriers direct to the steamer or steamers' docks upon arrival at the port or after storage or transit has been accorded by the carriers under tariffs which permit the application of the export rates, and also on traffic delivered to the party entitled to receive it at the carriers' seaboard stations to which export rates apply, which traffic is handled direct from carriers' stations to steamship docks and on which required proof of exportation or trans-shipment is given. (See Exceptions) (See Note A in Item).

"All shipments consigned in bills of lading for export to points covered herein are to be waybilled at the export rates named herein. Shipments not consigned in shipping orders or bills of lading for export, which are ordered for export after arrival at seaboard or outer holding yard or yards will be subject to the rates, rules and regulations applicable to export traffic, or the same as would have applied had the shipment been originally consigned for export, so long as the property has not passed from the possession of the carrier, subject to the reconsigning charge or other provisions as published in tariffs lawfully on file with the Interstate Commerce Commission. (Will not apply to Ports in Canada. See Item No. 3250 of tariff, as amended.)

"Export rates applicable on shipments exported direct from railroad terminals will apply on shipments consigned in bills of lading for export, handled through United States Naval Shipyards, Naval Bases or Army Bases or delivered to United States Government vessels docked thereat on presentation of proper evidence of exportation."

Defendant maintains that the last paragraph quoted is ambiguous and that we should construe it to mean "handled through (the military facility) by the railroad" and

"delivered by the railroad" to the government vessel docked thereat. In short, defendant's position is that in order to become entitled to the export rate the plaintiff was required to transport the shipments all the way through the military facility to the water carrier. Plaintiff concedes that under Item 3210–G it is generally incumbent upon the rail carrier to deliver the shipment to the water carrier in order for the export rate to apply, but it asserts that the last paragraph of that Item constitutes an exception by providing that when shipments are consigned in bills of lading for export from a military facility the export rate applies.

 The rule which governs the construction of railroad tariffs is that stated in United States v. Missouri-Kansas-Texas R.R. Co., 5 Cir., 194 F.2d 777, 778–779, where it was said:

"The construction of a printed railroad tariff presents a question of law and does not differ in character from that presented when the construction of any other document is in dispute. The four corners of the instrument must be visualized and all the pertinent provisions considered together, giving effect so far as possible to every word, clause, and sentence therein contained. The construction should be that meaning which the words used might reasonably carry to the shippers to whom they are addressed, and any ambiguity or reasonable doubt as to their meaning must be resolved against the carriers. But claimed ambiguities or doubts as to the meaning of a rate tariff must have a substantial basis in the light of the ordinary meaning of the words used and not a mere arguable basis. Hohenberg v. Louisville & N.R.R.Co., 5 Cir., 46 F.2d 952; Christensen v. Northern Pac. Ry. Co., 8 Cir., 184 F.2d 534; Norvell-Wilder Supply Co. v. Beaumont, Sour Lake & Western Railway Company, 274 ICC 547."

A careful study of Item 3210–G in the light of that rule has convinced us that defendant's position is untenable and that the export rate applied to the shipments in question. Considering the Item from its four corners, it is readily apparent from the first paragraph that in general the export rate "will only apply" to a shipment that does not leave the possession of the rail carrier and is delivered by it to the water carrier. However, by the same paragraph that general rule is made subject to the proviso that it is applicable "except as otherwise provided herein." That exception is found in the third paragraph of Item 3210–G, which provides that the export rate is applicable to shipments consigned in bills of lading for export from military facilities. To construe the third paragraph as defendant does would be tantamount to ruling that it has no effect and is mere surplusage. It would have been totally unnecessary to have included it in the Item if, as defendant maintains, it means that a rail carrier must handle a shipment through a military installation and deliver it to a government vessel in order to become entitled to the export rate. For under those circumstances the rail carrier would be entitled to the rate under the first paragraph of Item 3210–G. The apparent reason for the rule, at least in the case of the Brooklyn Army Terminal, is that rail carriers are not permitted to operate within the Terminal, a restriction which seemingly is not uncommon in such military facilities. See Chicago, Rock Island & Pacific R.R. Co. v. Furniture Forwarders of St. Louis, Inc., supra.

The judgment is affirmed.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of this court.

Accordingly, judgment affirmed.

ANDERSON, P. J., and RUDDY and WOLFE, JJ., concur.