Jones, Chief Judge,
delivered the opinion of the court:
The primary issue in this case is the amount of compensation which plaintiff, a motor carrier, is entitled to receive for its services in transporting freight cargo trucks in interstate commerce on Government bills of lading.
The shipments involved in the pending case were from *165 the Studebaker plant in South Bend, Indiana, to destinations in six other states during the years 1951, 1952, and 195B. It was a “driveaway service,” the vehicle being moved over the highway under its own motive power, with the carrier furnishing the operator, paying all expenses of the operation, and assuming full responsibility for the movement.
The tariff schedule which became effective May 19, 1951, and to which plaintiff was a party is as follows:
ADDITIONAL CHARGES EOR VEHICLES EQUIPPED WITH MORE THAN ONE DRIVING AXLE
Vehicles equipped with more than one driving axle will be subject to an additional charge of one (1) cent per mile for each driving axle in excess of one, which charge shall not apply on front axle which can he disengaged. [Emphasis supplied.]
We italicize the last clause because this case turns on the interpretation to be given that clause. If plaintiff’s interpretation is correct it would be entitled to recover $21,674.34 for the additional charge. On the other hand, if the additional charge is not proper then the defendant is entitled to the sum of $459.32 representing overpayments for which it has filed a counterclaim.
The trucks involved in this suit were the first to be equipped with an automatic clutch for controlling the engagement of the front axle. Theretofore the engagement and disengagement of the front axle were by lever operated by the driver. In other than normal conditions, such as rain, mud, snow, flood, ice, or on slippery wet pavement, it was desirable that the front axle be engaged.
In these particular trucks the clutch automatically became engaged when there was any slippage of the four rear wheels. Thus, there was a flow of power to the front axle which then became engaged. As soon as the normal conditions of the road were restored the clutch automatically became disengaged. In other words, what had theretofore been done by lever operated by the driver was now done automatically.
Both parties are agreed that the substantial ambiguities or expressions of doubtful meaning in the tariff are to be resolved in favor of the shipper, but that the ambiguity or *166 doubt must be a reasonable one and that the language should not be subjected to a strained construction. United States v. Interstate Commerce Commission, 198 F. 2d 958, 966 (D.C.Cir. 1952), cert. denied 344 U.S. 893 (1952); Union Wire Rope Corporation v. Atchison, T. & S. F. Ry. Co., 66 F. 2d 965, 966-967 (8th Cir. 1933), cert. denied 290 U.S. 686 (1933); Christensen v. Northern Pac. Ry. Co., 184 F. 2d 534 (8th Cir. 1950) ; Union Transfer Co. v. Renstrom, 37 N.W. 2d 383, 151 Neb. 326 (Sup. Ct. 1949).
However, in applying the rule as announced in the decisions cited and as applied in numerous decisions by the Interstate Commerce Commission to the language in question, we are unable to find any reasonable doubt as to the meaning of the provision. We can see no substantial difference in the result of having automatic as contrasted with mechanical engagement of the front axle when road conditions become abnormal, and disengagement when they become normal again. The end results are practically the same. The plaintiff claims that there are additional drivers’ wages and other costs connected with the automatically controlled front axles. As indicated in finding 11, these costs are not established. As a matter of fact, it is usually thought that labor-saving devices tend in the long run to reduce rather than increase ultimate costs. However this may be, we think the front axle could be and actually was engaged and disengaged at the beginning and end of abnormal road conditions, and therefore came within the express language of the rate schedule.
The writer recalls that on his father’s farm there were a good many rocks in one field. In using the cultivator in that field wooden pegs were placed in the shank so that when the plowshare or sweep hit a rock the peg would break and the plowpoint would drag back. It was then necessary to lift that part from the ground, restore the point to position, and insert another wooden peg. A short time thereafter someone in a manufacturing establishment with a “flash of genius” attached a strong spring which would 'hold the point in place, but when a rock was struck the point would automatically be drawn back and when the rock was passed the spring would pull it back into place. The fact *167 that it was automatic did not change the end result. The same purpose was accomplished in a different fashion. The plowpoint could be engaged and disengaged automatically rather than mechanically.
Likewise in the case at bar, we think the front axle not only could be but was engaged when abnormal road conditions developed, and was then disengaged when road conditions became normal again.
The plaintiff is not entitled to recover, and since the additional charge for the front axle is not proper, the defendant is entitled to recover on its counterclaim the sum of $459.32. Judgment will be entered for the defendant in that amount and plaintiff’s petition will be dismissed.
It is so ordered.
Dttrfee, Judge; LaRAmoke, Judge, and MaddeN, Judge, concur.
Whitaker, Judge, took no part in the consideration and decision of this case.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation organized and existing under the laws of the State of Ohio, and is now, and was at all times hereinafter mentioned, engaged as a common carrier by motor vehicle in the transportation of property for hire in interstate commerce by authority of the Interstate Commerce Commission.
2. During the years 1951, 1952, and 1953 plaintiff transported for defendant on Government bills of lading numerous new freight automobiles described as 2%-ton, 6x6 cargo trucks, M-34 and M-44 series, in a “driveaway service” from the Studebaker plant in South Bend, Indiana, to destinations in the States of Ohio, New Jersey, New York, Pennsylvania, Virginia, and Maryland. In a driveaway operation the vehicle is moved over the highway under its own motive power with the carrier (plaintiff) furnishing *168 the operator, paying all expenses of the operation, and assuming full responsibility for the movement.
3. The cargo trucks transported by plaintiff for the defendant were equipped with automatic transmissions and had two rear driving axles, one for each rear set of two wheels, and one front driving axle. During normal operation of the truck at high speeds on a dry surface, an overrunning sprag clutch on the drive to the front axle automatically eliminated delivery of power to the front axle. When, for any reason, there was a slippage of the four rear wheels, such as when the vehicle was being operated under other than normal conditions in rain, mud, snow, flood, ice, or on a slippery wet pavement, the clutch automatically engaged, and there was a flow of power to the front axle which then became engaged. None of the trucks was equipped with a lever or other means of manually disconnecting the front driving axle.
4. The trucks involved in this suit were the first to be equipped with the automatic clutch for controlling the engagement of the front axle. The automatic clutch was installed on the trucks to ctit down the number of levers in the cab. Military cargo trucks, prior to those involved in this case, were equipped in many instances with a lever by which the flow of power to the front axle could be manually disconnected and many are still so equipped.
5. Item 320-B of Supplement No. 4 to National Automobile Transporters Association Tariff No. 94-B, which became effective May 19, 1951, and to which plaintiff was a party, reads:
ADDITIONAL CHARGES EOR VEHICLES EQUIPPED WITH MORE THAN ONE DRIVING AXLE
Vehicles equipped with more than one driving axle will be subject to an additional charge of one (1) cent per mile for each driving axle in excess of one, which charge shall not apply on front axle which can be disengaged.
6. It is not disputed (1) that plaintiff has not collected the additional one cent for the front driving axle, or (2) that, in those instances in which plaintiff billed and collected for its services, the defendant, through its General Account *169 ing Office, has been refunded the amounts paid plaintiff by-reason of the front driving axle or has deducted such sums from other freight revenue due the plaintiff for other services. The amounts due the respective parties, depending on the resolution by the court of the issue of law, are stipulated facts set forth in finding 17.
7. Plaintiff contends that the additional one cent per mile is applicable for the front axle in the absence of any means available to the driver of the vehicle by which he can control, manually or otherwise, the engagement or disengagement of this driving axle. Defendant contends that the tariff provision does not require that the front axle be capable of manual disengagement and that, so long as it could be disengaged, whether manually or automatically, and the vehicle operated normally without power to the front wheels, the additional one cent per mile tariff charge would not apply.
8. Plaintiff and its drivers received instructions, verbally and in writing, from responsible officials of the Department of the Army and civilian inspectors at the plant of Studebaker Corporation, South Bend, Indiana, where the trucks were made, tested, and accepted, that the drivers were not to utilize the front axle drive at any time. Such an instruction could not be complied with by plaintiff’s drivers in the absence of a manual control by which the front axle drive could be physically disconnected from the engine. The front axle could be disconnected by the use of tools at the plant but not on the road. It was a complicated procedure and not a job for a “shade tree mechanic.”
9. Plaintiff produced as a witness a resident inspector in charge for the Department of the Army, a civilian who was located at the Studebaker plant and whose duty it was to test-drive the trucks and finally to accept them for defendant. He used a book in his work known as the “Department of the Army Technical Manual,” issued in June 1950, which shows on its cover that it pertains to 2%-ton, 6x6, M-34 cargo trucks of the same type as involved in this case. On page 45, the manual instructs drivers to use the front wheel drive in going through sand or flooded areas. The manual is found to refer to a vehicle that is equipped with a lever, *170 or other means, by which the driver can control the engagement of the front axle at his discretion.
10. No evidence was introduced to show that the front axle on any of the trucks here involved became engaged at any time during their transportation, there being no way to determine this fact. The evidence did establish that in fair weather the front axle would not engage, but that it would do so when the rear wheels slipped while running through sand, mud, snow, or ice, and that the trucks were transported in all kinds of weather. Drivers had no control over when the front axle would engage. The period during which the front axle would be engaged would vary with circumstances and last from a split second to longer periods.
11. Assuming the engagement of the front axle drive, the movement of the vehicle is slowed and it becomes more difficult to control since the rear end has a tendency to swerve. Plaintiff claims the slow movement put it to additional expense in several ways, including drivers’ wages, for the union classifies vehicles by their speed. Plaintiff’s costs, if any, in this regard are not established. Also, plaintiff claims that it would cost more to replace one of the automatically controlled front axles in case of damage. The evidence on the replacement cost is conflicting, vague and does not establish the fact. What costs, if any, were incurred by plaintiff for replacements is not established.
12. As noted in finding 4, the trucks transported by plaintiff and involved in this litigation were the first to be equipped with the automatic clutch which controlled the engagement of the front axle drive. Originally, plaintiff did not bill defendant for the extra cent per mile now claimed. Some 60 days after it started to transport the trucks, it started billing for the additional front axle drive.
13. For some years, including all of the times involved herein, plaintiff has been a member of the National Automobile Transporters Association, a nonprofit organization consisting of trucking companies engaged in transporting motor vehicles for hire throughout the United States. That association filed the tariffs involved in this case with the Interstate Commerce Commission.
14. The plaintiff presented as a witness the managing offi *171 cer of the association, who qualified as an expert in tariff matters. He explained that rates in the association tariffs are first submitted, by the carriers participating in such tariffs, to what is known as a Standing Nate Committee, which meets periodically and considers proposed rates, rules and regulations that are to go into the association’s tariff publications. The witness was on that committee for about five years prior to his employment by the association in January 1955. His interpretation of the words in the tariff, “which can be disengaged,” is that the driver must be able to disengage the front driving axle at his will. He does not agree with the defendant’s interpretation to the contrary.
15. Another expert witness for plaintiff was a director of rates and tariffs for Dealers Transit, Inc., of Chicago, Illinois, another association member. He has been a member of the Standing Bate Committee of the association most of the time since 1940. He was on the Standing Bate Committee when the questioned provision, “which can be disengaged,” was placed in the tariff here in dispute. He admitted that the language specified no restriction as to the method of disengagement and that it would be possible to disengage any front driving axle with proper tools and mechanical ability. He gave it as his opinion, however, that the reasonable construction of the language is that, where a driver could not under normal circumstances engage or disengage the axle with means readily at hand and where he has no control over it, the one-cent additional charge would apply.
16. Defendant offered no witness as a rate or tariff expert.
17. If the additional charge for the front axle were proper, plaintiff would be entitled to recover $21,674.34. Since the additional charge for the front axle is not proper, plaintiff is entitled to nothing in this suit, and defendant is entitled to recover $459.32 from plaintiff on its counterclaim for alleged overpayments.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.
*172 It is further concluded that defendant is entitled to recover on its counterclaim against plaintiff and it is therefore adjudged and ordered that the defendant recover of and from the plaintiff the sum of four hundred fifty-nine dollars and thirty-two cents ($459.32).